UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

                :

ISRAEL GAMERO, NORBERTO         :
MASTRANZO, and OSCAR SANCHEZ,   :
*individually and on behalf of others similarly* :
*situated,*                :

                :

          Plaintiffs,   :     15 Civ. 2697 (KPF)

                :

         v.       :     OPINION AND ORDER

                :

KOODO SUSHI CORP., *d/b/a* KOODO   :
SUSHI, RAYMOND KOO, and MICHELLE :
KOO,              :

                :

          Defendants. :

                :

------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 28, 2017

KATHERINE POLK FAILLA, District Judge:

    Plaintiffs Israel Gamero, Norberto Mastranzo, and Oscar Sanchez are

former employees of Defendant Koodo Sushi, a Manhattan restaurant.  In

2015, Plaintiffs sued Koodo Sushi and its owner, Defendant Michelle Koo

(together with Koodo Sushi, "Defendants"),[1] claiming that Defendants had

committed wage-and-hour and recordkeeping violations of the Fair Labor

Standards Act, 29 U.S.C. §§ 201-219 (the "FLSA"), and the New York Labor

---

[1]    Plaintiffs also sued Raymond Koo, Michelle Koo's brother.  (Dkt. #1; *see* Trial Transcript
("Tr.") 176).  The parties now agree that "Raymond Koo does not [participate] and has
not participated in the ownership, operation, or control of Koodo Sushi."  (Joint Pretrial
Order ("JPTO") (Dkt. #62)), Joint Stipulation of Fact 2).  The Court thus understands
that Plaintiffs have abandoned any claims they once asserted against Raymond Koo.  All
references to "Koo" in this Opinion refer only to Michelle Koo.

    The Court pauses to commend the work of Latham & Watkins LLP, which began
representing Defendants on a *pro bono* basis shortly before trial began.  The conduct of
the Latham attorneys at trial, and the quality of their written submissions, merits the
Court's appreciation and approbation.

Law, §§ 190-199A, 650-665 (the "NYLL").  This case proceeded to a bench trial in October 2016.  This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

The Court has reviewed the transcript of the trial, the trial exhibits, and the parties' post-trial submissions.  And the Court has considered those materials in light of its own recollections of the trial and its perception of the credibility of the witnesses who testified.  The Court concludes that Plaintiffs are entitled to relief on seven of their nine claims against Defendants.  But the Court also concludes that Plaintiffs may recover only a fraction of the damages they seek — in total, $24,937.12, plus prejudgment interest.

## FINDINGS OF FACT[2]

The bulk of the parties' dispute, as presented at trial, centered on two questions:  *First*, how many hours per week did Plaintiffs work at Koodo Sushi? And *second*, how much did Koo pay Plaintiffs for their work?  Each side answered these questions differently, and the Court found evidentiary problems with both Plaintiffs' and Defendants' cases.

Plaintiffs all testified that they worked over 50 hours per week for most of their tenures at Koodo Sushi.  (Pl. FF ¶¶ 9-10, 22, 35-36).  They also claimed that Koo paid them fixed salaries — per shift for Gamero, and per week for

---

[2]     This Opinion cites to several documents, including the transcript of the trial and the exhibits that Plaintiffs ("Pl. Ex.") and Defendants ("Def. Ex.") introduced; Plaintiffs' Proposed Findings of Fact and Conclusions of Law (Dkt. #75), which is subdivided into Findings of Fact ("Pl. FF") and Conclusions of Law ("Pl. CL"); Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. FFCL" (Dkt. #76)); Defendants' post-trial brief ("Def. Br." (Dkt. #77)); the JPTO; a Stipulation of Fact the parties executed mid-trial ("10/19/16 Stipulation"); and Plaintiffs' Complaint ("Compl. (Dkt. #1)).

Mastranzo and Sanchez — that fell below then-prevailing federal and state minimum wage statutes.  (*Id.* at ¶¶ 12, 24-25, 38-40; Pl. CL ¶ 106).

But in general, Plaintiffs' accounts of their hours and wages did not square with the payroll records Defendants submitted.  Relying on those records and Koo's recollection of how she operated her restaurant, Defendants argued that Plaintiffs had overestimated — and in Gamero's case, substantially overestimated — their hours.  (*See* Def. FFCL ¶¶ 78-81, 102-03, 105-06, 111, 138, 146, 152, 155-57).  Defendants also contended that Koo paid Plaintiffs by the hour, at rates that met or exceeded minimum wage, either in the first instance or once certain credits were deducted.  (*See id.* at ¶¶ 87-88, 107-08, 114-15, 140-43, 148-49).

To be sure, the Court was troubled by many issues with Defendants' payroll records.  Koo inconsistently tracked Plaintiffs' hours and wages.  Some of her records are confusing; some are nearly illegible.  But in the main, Defendants' account of Plaintiffs' hours and wages was more credible than the accounts Plaintiffs offered.  Koo, in addition to evincing genuine concern for her employees' well-being, was by far the most credible witness at trial, and the Court largely accepted her testimony concerning the accuracy of the records she kept.

Against the backdrop of this global point, the Court will set forth its Findings of Fact.  The Court will begin by listing its factual findings concerning Koodo Sushi and its general business practices.  The Court will then turn to Koo and discuss how she calculated her employees' wages, and how she

maintained payroll records.  Finally, the Court will explain its findings

concerning the hours and wages of Sanchez, Mastranzo, and Gamero.

**A.    Koodo Sushi**

Koodo Sushi is a Japanese restaurant located in the Financial District of

downtown Manhattan.  (JPTO, Joint Stipulation of Fact 2).  Its business has

declined in recent years:  Koodo Sushi recorded $763,389 in gross receipts in

the 2013 tax year, $520,242 in the 2014 tax year, and $493,039 in the 2015

tax year.  (10/19/16 Stipulation).

During the time Plaintiffs worked at Koodo Sushi — 2009 to 2015 — the

restaurant was open to customers from 11:00 a.m. to 3:00 p.m. and 5:00 p.m.

to 10:00 p.m. on weekdays, and from 5:00 p.m. to 10:00 p.m. on weekends.

(Def FFCL ¶¶ 8, 10; *see* Tr. 19-20, 177, 320).  From 11:00 a.m. to 3:00 p.m.,

Koodo Sushi serves lunch; from 5:00 p.m. to 10:00 p.m., it serves dinner.

(Tr. 179).

Most of Koodo Sushi's lunch customers eat in the restaurant, and the

restaurant usually gets busy between just after noon and 2:00 p.m.  (Tr. 179).

By contrast, most of Koodo Sushi's dinner business is delivery; 7:00 p.m. is the

busiest part of Koodo Sushi's dinner shift.  (*Id.* at 179-80).  Koo stops accepting

dine-in customers at 9:00 p.m., and stops taking delivery orders at 9:50 p.m.

(*Id.* at 186).  Usually, Koodo Sushi's employees leave the restaurant promptly

at 10:00 p.m.  (*Id.* at 321-2).

On weekdays from 3:00 p.m. to 5:00 p.m., all Koodo Sushi employees

take a "nap break," although some employees will leave the restaurant to go

shopping or attend to personal matters during this period.  (Tr. 186-87, 308; *see also id.* at 31).  Koodo Sushi's "lights are off" from 3:00 p.m. to 5:00 p.m., and the restaurant is closed for business.  (*Id.* at 187-88, 321).  Koodo Sushi employees also enjoy two meal breaks during the day: a mid-day lunch around 2:00 p.m. to 2:30 p.m., and an evening dinner around 8:30 p.m. to 9:00 p.m. (*Id.* at 179, 182, 308-09).  Koodo Sushi provides the food for these meals.  (*Id.* at 309).

**B.    Koo's Wage Calculations and Payroll Records**

Koo owns Koodo Sushi.  (JPTO, Joint Stipulation of Fact 2).  And by Koo's account, she alone is responsible for determining how — and how much — her employees are paid.  (Tr. 189).

Even before Plaintiffs filed this lawsuit, Koo had a measure of difficulty carrying out these tasks.  In 2008, the New York Department of Labor investigated Koo for spread-of-hours and overtime violations, and Koo ultimately paid a $2,000.00 fine.  (Tr. 13, 359-60).  As a result of that investigation, Koo learned about several wage-and-hour laws, including New York's spread-of-hours requirement, and the ability of employers to deduct tip and meal credits from their employees' wages.  (*See id.* at 188-90, 374-75).

Defendants concede that "Koo's efforts to comply with" federal and state wage-and-hour "laws may well have been imperfect."  (Tr. 13).  The evidence at trial made this plain.  Below, the Court explains how Koo calculated her employees' wages and how she maintained payroll records.

1.     **Koo's Wage Calculations**

Koo paid her employees on a "weekly or biweekly" schedule.  (Tr. 189).
She paid all three Plaintiffs by the week, in cash.  (*Id.*).  To determine how
much her employees were due each week, Koo calculated their hourly wages.
(*Id.*).  Thus, her employees' weekly take-home pay varied depending on how
many hours they worked in a given week.  (*Id.* at 189-90).  But in general,
Koo's employees earned the same amount of money week over week, because
their schedules were "very fixed."  (*Id.*).

Koo testified that any Koodo Sushi employee who received minimum
wage would be paid at that rate for 40 hours of work per week.  (Tr. 193).  If a
minimum-wage employee worked more than 40 hours in a week, they would be
paid time and a half.  (*Id.*).  Koo also deducted a meal credit from her
employees' wages:  She testified that the amount of the meal credit was $2.50
in 2008 (as the Department of Labor investigator explained to Koo), and it later
decreased to $1.50.  (*Id.* at 191-92).  For each meal break her employees took,
Koo would deduct 30 minutes from their daily compensable working hours.
(*Id.* at 192-93).  Koo also deducted a tip credit from certain employees' hourly
wages.  (*Id.* at 190-92).

The actual wages Koodo Sushi's employees received varied depending on
what job they fulfilled at the restaurant.  Kitchen workers earned minimum
wage as a baseline, but Koo would pay them more "based on their technical
skill."  (Tr. 190).  A kitchen worker whose "job … required more skill" would
thus earn more "per hour."  (*Id.*; *see id.* at 391-93 (Koo explaining that she

increased Sanchez's hourly rate when he learned how to prepare a new type of sushi roll)).  Koodo Sushi's dishwashers earned minimum wage.  (*Id.* at 190). Delivery workers would receive minimum wage, less a tip credit.  (*Id.*).  Koo explained that, accounting for meal and tip credits, delivery workers were owed $3.85 per hour, but she paid them $5.00 per hour.  (*Id.* at 190-91).

Koodo Sushi accepted delivery orders by phone and through online ordering, and Koo processed the tips her employees earned based on how customers paid those tips.  When a customer called in a delivery order and tipped a Koodo Sushi delivery person in cash, that delivery person would take his tip "directly from [the] customer's hands."  (Tr. 235).  If, instead, a call-in customer paid a tip by credit card — by indicating the amount they wished to tip on their receipt — Koo would pay the employee who made that delivery "the exact amount" on the receipt with cash from the register.  (*Id.* at 235-36).

Koo processed tips from online orders differently.  Koodo Sushi used two third-party vendors — Delivery.com and Seamless Web ("Seamless") — to accept online delivery orders.  (Tr. 237).  Delivery.com would take an unspecified commission from the cost of the meals customers ordered, but not from the tips customers paid Koodo Sushi's delivery people.  (*Id.* at 238).  Thus, if a Koodo Sushi delivery person fulfilled a delivery placed through Delivery.com, he would receive the full amount of his tip.  (*Id.* at 386-87). Seamless, in contrast, took an approximately 14% commission "of the money" — including tips — Koodo Sushi derived from orders placed through

Seamless.  (*Id.* at 239).[3]  Thus, Koodo Sushi's delivery workers would receive the tips that Seamless customers placed, less Seamless's 14% commission.  (*Id.*).  Koodo Sushi would not "make up the difference."  (*Id.* at 240).

Because Delivery.com did not take a commission from delivery tips, but Seamless did, Koo offered her employees the option of not making deliveries placed through Seamless.  (Tr. 240-41).  On a date Koo could not recall, she wrote a letter extending this offer to her employees, "and every single one" — including Plaintiffs — "signed it."  (*Id.* at 241).  The letter was not introduced into evidence at trial; Koo recalled that the letter explained to her employees the "consequence" of making Seamless deliveries.  (*Id.* at 386-87).  The letter was in English, not Spanish.  (*Id.* at 387).  None of Koodo Sushi's employees chose to forego making Seamless deliveries.  (*Id.* at 241).  Koo also testified that it was her "regular procedure" to remind her employees that Seamless withheld a portion of delivery tips.  (*Id.* at 242).

The Court credits Koo's testimony that she calculated her employees' wages by the hour, accounting for minimum wage and applicable credits.  But Koo failed to communicate many of her calculations to Plaintiffs.  On cross examination, Koo conceded that between 2009 and 2015, she did not give any of her employees Spanish-language employment documents.  (Tr. 369-70).  Koo also did not give all of her new employees written notices for their own records

---

[3]    Koo testified that Seamless's commission consisted of (i) a 13.8% standard commission and (ii) an extra 0.05% commission Koodo Sushi paid in order to receive the money it earned from Seamless orders one month after the orders were placed, instead of two months.  (Tr. 238-39).

setting forth their hourly wages.  (*Id.* at 369; *cf. id.* at 249-50, 253 (Koo recalling that sometime after she hired Sanchez, a "translator" wrote out for Sanchez "a small list" of Sanchez's hours and weekly pay in Spanish)).  And although Koo would explain to her employees that she was deducting tip and meal credits from their pay, she never committed these explanations to paper. (*Id.* at 371-73; *cf.* Def. Ex. O (schedule Koo prepared for Sanchez, on which Koo calculated Sanchez's wages and wrote "Less Lunch + Dinner Meal").   Koo testified that she tries to stay current with wage-and-hour laws by visiting "the website" (for the New York Department of Labor, the Court inferred) each December.  (Tr. 301).  While the Court credits Koo's good intentions, her efforts to comply with those laws have been deficient in several respects.

### 2.   Koo's Payroll Records

Before explaining the various methods Koo used to track her employees' hours and wages, the Court makes two general points.  *First*, there is no single document that sets forth Plaintiffs' working hours and wages in full.  Instead, the records Defendants introduced at trial were akin to pieces of a puzzle: Only by reading them in tandem could the Court discern a coherent (but not totally complete) account of Plaintiffs' hours and wages.  *Second,* between 2009 and 2015, Koodo Sushi did not have a system employees could use "to punch in and out" of work.  (Tr. 378).  Even today, Koodo Sushi's employees do not "sign in when they come" to work or "sign out when they" depart.  (*Id.* at 407).

But although Koo's payroll records were somewhat haphazard, Koo explained them in a way the Court understood.  Koo also delivered a consistent

account of the shifts Plaintiffs worked and the wages she paid them.  And as a result, Koo demonstrated why her payroll records substantiate Defendants' arguments about Plaintiffs' hours and wages.

With these caveats in mind, the Court addresses the five types of payroll records Defendants introduced at trial: (i) login sheets; (ii) delivery login sheets; (iii) Seamless delivery reports; (iv) the Aldelo system; and (v) Koo's calendar.

### a.    Login Sheets

After the New York Department of Labor investigated Koodo Sushi in 2008, Koo began hanging employee login sheets on the wall of the restaurant's kitchen.  (Tr. 195-96; *see, e.g.*, Def. Ex. E).  The sheets had spaces for Koodo Sushi's employees to sign in each morning and sign out each night.  (Def. Ex. E, V-17).  Koo continued preparing these sheets on a weekly basis through early 2013, although Koo recalled "a period of time" between 2008 and 2013 when she stopped using these sheets.  (*Id.* at 197-99).

The login sheets achieved mixed results.  Although Koo instructed her employees to sign the login sheets — and threatened not to pay them if they failed to do so — the employees complied irregularly.  (*See* Tr. 195-96, 198).  And sometimes, Koodo Sushi employees would sign in for each other:  Mastranzo, for example, testified that his co-worker Tito would occasionally fill out Mastranzo's section of a login sheet "as a joke."  (*Id.* at 108, 113-15).   On cross-examination, Koo "agree[d]" with defense counsel that the login "sheets were not accurate representations of the[ ] hours" Plaintiffs "worked."  (*Id.* at 383).

Assuming that none of her employees disputed how much they were paid in a given week, Koo would throw away that week's login sheet.  (Tr. 384).  Koo did not believe she needed to maintain these records.  (*Id.* at 384-85).

### b.    Delivery Login Sheets

Koo used a different type of login sheet for delivery employees. (Tr. 291-92; *see* Def. Ex. A, B, V-1).  Koo would print these delivery login sheets each month, "put [them] in a binder," and place the binder "on [a] table." (Tr. 291).  Koo testified that these sheets displayed the shifts that Koodo Sushi delivery people worked, and also the wages they received.  (*Id.* at 291-92).

### c.    Seamless Delivery Reports

Koo also used daily Seamless delivery reports to record payments to her delivery employees.  (Tr. 201-02, 242-43).  These reports were computerized; Koo would print them out and write on them the names of delivery employees who worked in a given week.  (*Id.* at 242; *see* Def. Ex. I).  So, for example, on a report dated June 26, 2014, Koo wrote "Israel" (for Plaintiff Gamero), then indicated the tips Gamero received from Delivery.com and Seamless orders on Tuesday, Wednesday, Thursday, and Friday of that week.  (Tr. 243; Def. Ex. I). And on the right side of this June 26, 2014 report, Koo circled two numbers — "80.16 + 60" — which indicated, respectively, the tips Gamero received and his hourly wages for that week.  (Tr. 243-44; Def. FFCL ¶ 64).

### d.    Aldelo

From 2010 through 2013, Koo recorded her employees' hours and wages using Aldelo, a computerized payroll system.  (Tr. 217-18).  Koo's Aldelo

records were by far the most coherent — and helpful — exhibit that Defendants introduced at trial.  (*See* Def. Ex. L).

Each time Koo was ready to pay a Koodo Sushi employee, Koo (or, if Koo was on vacation, Koodo Sushi employee Zha Wong) would make an entry in Aldelo.  (Tr. 218-19).  Through Aldelo, Koo would then print (on thermographic paper that, over time, has faded to varying degrees) a paystub indicating how much that employee would be receiving.  (*Id.* at 223, 233-34; *see* Def. Ex. G).  Koo made her employees sign these paystubs before she paid them.  (Tr. 223; *see* Def. Ex. G, J).  The paystubs were dated in two ways:  They indicated (i) the date and time Koo generated the paystub and (ii) the pay period for which the employee signing the paystub was being compensated.  (Tr. 223; *see* Def. Ex. J).

Aldelo generated a global record — the "Pay Out Details Report" — of the payment entries Koo made in the program.  (Tr. 230-32, Def. Ex. L).  At trial, Defendants introduced a version of the Pay Out Details Report reflecting the payments Koo made to Plaintiffs.  (Def. Ex. L).  Each line of this document corresponds to an individual paystub Koo generated through Aldelo.  (Tr. 223, 232-33; *see* Def. Ex. L).  The Pay Out Details Report has five columns:

    i.    "Paid To":  This column indicated the name of the employee who received a given paystub and that employee's role at Koodo Sushi.  (Tr. 223).  "Israel D" corresponded to Gamero, a delivery worker; "Oska K" signified Sanchez, who worked in the kitchen; and "Rob K" was Mastranzo, who also worked in the kitchen.  (*Id.* at 220-21; *see generally* Def. Ex. L).

    ii.    "Date/Time":  This column indicated the date and time that Koo created a paystub.  (Tr. 223).

iii. "Amount Paid":   This column displayed the value of each paystub reflected in the Pay Out Details Report. (Tr. 223).

iv. "Description":   These entries showed the pay period to which a paystub corresponded. (Tr. 223-24).  Some of these entries display a range of dates (e.g., "12/31-1/6/13"), while others show a single date (e.g., "9-Jun"). (Def. Ex. L., at 2142-43).   Other entries in the Description column read "tips" (to show tips an employee received) or "extra" (for "extra performance" payments Koo gave her employees when they completed an "extra job"). (Tr. 225).

v. "Paid By":  Finally, the Pay Out Details Report's fifth column showed which Koodo Sushi employee generated the paystubs reflected in the report; in almost every case, this was Koo.  (Tr. 224; *see* Def. Ex. L).

Koo explained that the Pay Out Details Report is the best source of information about the wages she paid her employees between 2009 and 2013. (Tr. 233).  The Court agrees.

### e. Koo's Calendar

In late 2013 or early 2014, Koo stopped using Aldelo and instead began recording some of her employees' shifts and wages in a calendar.  (Tr. 209, 213, 217; Def. Ex. K).  Entries for payments Koo made to Sanchez and Mastranzo (but not Gamero) appear throughout the calendar.  (*Id.* at 210; *see generally* Def. Ex. K).[4]

An example from the calendar helps explain how Koo used it.  In a box dated January 12, 2014, the name "Rob" (for Mastranzo) appears; next to

---

[4]    Defendants introduced a scanned copy of the calendar at trial.  (Def. Ex. K).  They also submitted to the Court the original calendar, which has much larger pages than the scanned exhibit version.  In drafting this Opinion, the Court generally relied on the original calendar because it is easier to read.

"Rob," Koo wrote "400," which indicates how much Koo paid Mastranzo for the work he performed in the preceding week (January 6 through January 12). (Tr. 210-11; Def. Ex. K, at 2157).  In this same box, Koo also wrote "Oska" (for Sanchez") and "1/10," which indicates that Koo paid Sanchez on January 10. (Tr. 210; Def. Ex. K, at 2157).  The Aldelo Pay Out Details Report states that Koo paid Sanchez $556.65 on that date.  (Def. Ex. L, at 2145).  In other calendar entries — April 20, 2014, for example — Koo wrote a date next to "Oska" ("4/17"), and the amount Sanchez was paid on that date ($550.00) appears in the April 17, 2014 calendar entry.  (Def. Ex. K, at 2162).

Many early 2014 calendar entries also indicate the shifts (and, by extension, the number of hours) that Sanchez and Mastranzo worked in a given day.  On January 8, 2014, for example, Koo wrote "11-3" and "5-10" next to "Oska" and the same numbers next to "Rob."  (Def. Ex. K, at 2157).  But Koo abandoned this practice over time; instead, she used the calendar to keep track of when her employees *deviated* from their normal work schedules.  (Tr. 214-15).  Koo explained that she stopped recording her employees' daily schedules on the calendar because (more glibly) she "was lazy" and (less glibly) she "was working so long."  (*Id.* at 213-14).

### 3. Plaintiffs' Hours and Wages[5]

One major takeaway of the trial was that Koo paid her employees by the hour. (Tr. 189). As a result, Plaintiffs' wages varied depending on how many hours they worked per week. Below is a general summary of Plaintiffs' hours and wages; the Court will consider these figures at a more granular level when it calculates Plaintiffs' damages in the Conclusions of Law section of this Opinion.

#### a. Sanchez

Sanchez worked at Koodo Sushi from August 2009 through February 2015. (Tr. 15-16; *see id.* at 245, Def. FFCL ¶ 136). For his first month of employment, Sanchez was a dishwasher and delivered food. (Tr. 22). Then, Koo asked Sanchez if he "wanted to learn how to prepare sushi," and Sanchez said he did. (*Id.* at 22, 245). Sanchez continued working as a sushi chef until he left Koodo Sushi. (*Id.* at 24).

For most of his employment at Koodo Sushi, Sanchez worked the same schedule: 11:00 a.m. to 3:00 p.m. and 5:00 p.m. to 10:00 p.m. on weekdays, and 5:00 p.m. to 10:00 p.m. on one weekend day. (Def. FFCL ¶¶ 138, 146; Tr. 23-24). Between December 2014 and February 2015, Sanchez worked on a

---

[5]     Plaintiffs testified that they were required to purchase various items — "tools of the trade" — in order to work at Koodo Sushi. (Tr. 32-35, 86-87, 134). The Court credits none of this testimony. Koo and non-party defense witness Joe Zhou explained that Plaintiffs were not required to purchase any items to work at Koodo Sushi, and they testified credibly that Koodo Sushi *provided* many of the items Plaintiffs allegedly purchased. (*Id.* at 268-72, 285, 309-10, 314). The Court thus rejects Plaintiffs' testimony on this score.

"half time" schedule:  He was at the restaurant from 11:00 p.m. to 3:00 p.m. on weekdays.  (*Id.* at 25, 27).

Sanchez's salary also varied throughout his time at Koodo Sushi.  When Sanchez started at the restaurant, Koo paid him $350.00 per week.  (Tr. 251-52; Def. Ex. O).  That rate reflected payment for 40 hours of dishwashing work at minimum wage ($7.25), plus 10 hours of delivery work at a lower rate ($4.25) for which Sanchez would be paid time and a half ($6.375).  (Tr. 251-52; Def. Ex. O).  Once meal and tip credits were deducted, Sanchez's weekly take-home pay (by Koo's calculations) should have been "way less than" $350.00, but Koo paid him this higher amount anyway.  (Tr. 252).

Sanchez earned more as a sushi chef.  Koo gave Sanchez periodic raises when, for example, Sanchez learned how to prepare a special sushi roll. (Tr. 261).  Koo would also give Sanchez a bonus of $10.00 per day if he did not make any major mistakes on the job.  (*Id.* at 261-62).  At his peak, Sanchez was earning a regular wage of $9.00 per hour at Koodo Sushi.  (*Id.*).  And as the Pay Out Details Report confirms, Koo occasionally paid Sanchez for extra tasks he performed at the restaurant.  (*Id.* at 225; Def. Ex. L, at 2143, 2148).

### b.    Mastranzo

Mastranzo worked at Koodo Sushi from January 2010 until February 2015.  (Def. FFCL ¶ 99; *cf.* Tr. 72-73 (Mastranzo testifying that he began working at Koodo Sushi in June 2010)).  Initially, Mastranzo washed dishes and cleaned the restaurant, and about a year after coming onboard he also made deliveries in the evening.  (*Id.* at 79, 288-89).  Mastranzo generally

worked at Koodo Sushi from 11:00 a.m. to 3:00 p.m. and 5:00 p.m. to 10:00 p.m. on weekdays, and from 5:00 p.m. to 10:00 p.m. on one weekend day. (*Id.* at 291, 295; Def. Ex. K, at 2157; Def. Ex. V-1) Koo paid Mastranzo minimum wage for the hours of the day when he washed dishes and $5.00 per hour when he made deliveries. (Tr. 399-400).

### c. Gamero

Gamero began working at Koodo Sushi in November or December 2012 and left in March or April 2015, with a roughly one-year gap in between. (Tr. 132, 135, 277; Def. FFCL ¶¶ 74-74; Pl. Ex. 3, at 1412). Gamero was a delivery person; he worked part-time a few days per week. (Tr. 275, 284-85). When Koo hired Gamero, she offered him the opportunity to make deliveries from 6:00 p.m. to 8:00 p.m., or 6:00 p.m. to 10:00 p.m. (*Id.* at 279). Gamero vacillated between these two shifts over time, and Koo agreed to pay him $5.00 per hour (again, minimum wage minus tip and meal credits, plus a "cushion"). (*Id.* at 275-76, 279-81; Def. Ex. F). Koo recalled that the most Gamero ever worked in a single week was "[m]aybe" 30 hours, and "[d]efinitely not 40." (*Id.* at 277).

The Court has already explained that, in large part, it is accepting Defendants' take on Plaintiffs' hours and wages. With that said, Sanchez's and Mastranzo's recollections of their working hours were not that different from Koo's recollections of the same. This was not the case for Gamero. There were major gaps in Gamero's testimony, and he made many statements that were not believable. Gamero, in short, was not a credible witness.

To start, Gamero gave a confusing and inconsistent account of the number of months he worked at Koodo Sushi.  He testified that he began working at the restaurant in November 2011.  (Tr. 117).  But the Aldelo Pay Out Details Report indicates that the first payment Gamero received was in December 2012, and there is a November 29, 2012 Seamless delivery report that appears to bear Gamero's signature.  (Def. Ex. L, at 2142; Pl. Ex. 3, at 1412).  Gamero also claimed that beginning in November 2013, he took a year-long break from Koodo Sushi.  (Tr. 120, 132).  However, Koo paid Gamero for work he performed at Koodo Sushi in mid-2014.  (*Id.* at 152; Def. Ex. V-21).  Further, on cross-examination, Gamero conceded that he was "not certain how many months [he] worked when [he] returned after being absent for a year." (Tr. 152-53).

Gamero also inflated his hours.  Gamero claimed that on his first day of work, Koo told him that he would be working from 11:00 a.m. to 3:00 p.m. and from 5:00 p.m. to 10:00 p.m. on weekdays, and from 5:00 p.m. to 10:00 p.m. on Sundays.  (Tr. 120).  That schedule is suspiciously similar to the schedules Sanchez and Mastranzo — both of whom performed at least some non-delivery work every day — worked at Koodo Sushi.  It also did not accord with documents Gamero signed indicating that he worked less than half that much per week.  (Def. Ex. V-40; *see* Tr. 147-49 (Gamero admitting that he signed Seamless delivery report indicating he worked nine hours in one week, but claiming that the document was incorrect and that he did not look at the "9 HRS" appearing next to his signature)).  And the Court found it unlikely that

Koo would pay Gamero to make deliveries for four hours during Koodo Sushi's lunch shift, given that the majority of Koodo Sushi's lunch customers dined in, and given that Koo had a full-time delivery worker — Zhang Yao Zhong — on staff.  (Tr. 179, 324).

Gamero's testimony about how much Koo paid him was similarly implausible.  He testified that Koo paid him $15.00 per shift (11:00 a.m. to 3:00 p.m., and 5:00 p.m. to 10:00 p.m.), for a total of $30.00.  (Tr. 121-22).  But on cross, Gamero admitted that there were multiple weeks when he earned $90.00 for 18 hours of work (i.e., Koo paid Gamero $5.00 per hour).  (*Id.* at 145-47; *see* Def. Ex. V-29, V-34).

Gamero made other statements that undermined his credibility.  Gamero testified that Koo made him vacuum Koodo Sushi's stairs each morning, and that this task took him half an hour.  (Tr. 118).  But on cross-examination, Gamero estimated that the restaurant had about 15 stairs, which would mean that he spent approximately two minutes vacuuming each of them.  (*Id.* at 161).  Gamero also testified that Koo instructed him to cut cardboard every weekday for one hour between 2:30 p.m. and 3:30 p.m.  (*Id.* at 119-20).  On cross, Gamero claimed that he cut 60 to 70 pieces of cardboard per day; when asked whether he spent a full minute cutting each piece of cardboard, Gamero admitted that he did not.  (*Id.* at 162).  And Gamero testified that he purchased *two* bicycles in order to make deliveries for Koodo Sushi, without explaining why one would have been insufficient.  (*Id.* at 134).

19

In sum, Gamero presented an inconsistent — and in many times, false — account of his hours and wages.  The Court found him not credible.

## CONCLUSIONS OF LAW

Plaintiffs asserted nine causes of action in their Complaint, and they pursued all nine at trial:

i.   <u>First Cause of Action</u>:  Violation of the minimum wage provisions of the FLSA.

ii.  <u>Second Cause of Action</u>:  Violation of the overtime provisions of the FLSA.

iii. <u>Third Cause of Action</u>:  Violation of the New York Minimum Wage Act.

iv.  <u>Fourth Cause of Action</u>:  Violation of the overtime provisions of the NYLL.

v.   <u>Fifth Cause of Action</u>:  Violation of the Spread of Hours Wage Order of the New York Commissioner of Labor.

vi.  <u>Sixth Cause of Action</u>:  Violation of the notice and recordkeeping requirements of the NYLL.

vii. <u>Seventh Cause of Action</u>:  Violation of the wage statement provisions of the NYLL.

viii. <u>Eighth Cause of Action</u>:  Recovery of equipment costs under both statutes.

ix.  <u>Ninth Cause of Action</u>:  Violation of the tip-withholding provisions of the NYLL.

The first five of these causes of action are related:  They all assert that Defendants paid Plaintiffs insufficient wages, and the Court will thus consider all five in tandem.  The Court will address Plaintiffs' four remaining causes of action individually.

At the risk of belaboring the point, the Court has largely credited Defendants' case over Plaintiffs'.  But Plaintiffs are still entitled to damages under their First through Seventh Causes of Action.  Plaintiffs established that they were underpaid in violation of New York and federal law.  And Koo concedes that she violated New York's recordkeeping and wage-statement requirements.  Plaintiff's tools-of-the-trade claim (their Eighth Cause of Action) and their tip-withholding claim (their Ninth) fail.

Below, the Court analyzes Plaintiffs' causes of action, then separately explains why Plaintiffs are entitled to recover prejudgment interest.

## A.   Plaintiffs Are Entitled to Relief on Their First, Second, Third, Fourth, and Fifth Causes of Action, Because Koo Paid Them Less Than the FLSA and the NYLL Required

### 1.   Applicable Law

"The FLSA and the NYLL both 'guarantee[ ] compensation for all work ... engaged in by [covered] employees." *Salinas* v. *Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting *Kuebel* v. *Black & Decker Inc.*, 643 F.3d 352, 359 (2d Cir. 2011)).[6]  "To establish liability on a claim for

---

[6]    The parties agree that Koo is an "employer" within the meaning of the FLSA and the NYLL.  "In order to establish a violation of the FLSA, a plaintiff must first show that [he] is a 'covered employee,' who was 'employed in an enterprise engaged in interstate commerce or in the production of goods for interstate commerce.'"  *Garcia-Devargas* v. *Maino*, No. 15 Civ. 2285 (JLC), 2017 WL 129123, at *4 (S.D.N.Y. Jan. 13, 2017) (citation omitted).  "Likewise, [t]o recover under the NYLL, [a plaintiff] must prove that he was an 'employee' and that [the defendants] were 'employers' as defined by the statute."  *Id.* (internal quotation marks and citations omitted).  The parties stipulated that "Koo was an employer of Plaintiffs for purposes of the FLSA and the NYLL[.]"  (JPTO, Joint Stipulation of Fact 3).

However, during Plaintiffs' final year of employment at Koodo Sushi — 2015 — the restaurant was *not* "an enterprise engaged in interstate commerce" under the FLSA.  *Garcia-Devargas*, 2017 WL 129123, at *4 (citation omitted).  To qualify as an enterprise engaged in interstate commerce, a restaurant must, *inter alia*, have an "annual gross volume of sales made or business done [that] is not less than $500,000."  29 U.S.C.

underpayment of wages, 'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'" *Id.* (quoting *Kuebel,* 643 F.3d at 361); *see Tapia* v. *Blch 3rd Ave. LLC*, No. 14 Civ. 8529 (AJN), 2016 WL 4581341, at *4 (S.D.N.Y. Sept. 1, 2016) (under the FLSA and the NYLL, "[p]laintiffs bear the burden of proof to establish all claims and damages by a preponderance of the evidence") .

Where an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme to determine whether an employee has established that he was underpaid, and what damages he suffered.  The metes and bounds of these burdens are similar under both the FLSA and the NYLL:

*FLSA*:  "When an employer fails to maintain accurate and complete records of the hours employees work and the amounts they are paid, the plaintiff-employee need only … submit 'sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred.'" *Gonzalez* v. *Masters Health Food Serv. Inc.*, No. 14 Civ. 7603 (VEC), 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (quoting *Reich* v. *S. New*

---

§ 203(s)(1)(A)(ii).  Koodo Sushi met this $500,000.00 threshold in 2013 and 2014, but not 2015.  (10/19/16 Stipulation).  Plaintiffs recognize this:  They argue that "Defendants are … subject to the overtime wage requirements of the FLSA for the years 2013 and 2014." (Pl. CL ¶¶ 10-11).  But Defendants were not subject to the FLSA's wage-and-hour requirements in 2015.

The NYLL, unlike the FLSA, does not impose an enterprise-value requirement.  *Garcia-Devargas*, 2017 WL 129123, at *4.  And as a result, Plaintiffs may recover damages for Defendants' 2015 violations of the NYLL.  As the Court will explain *infra*, to some extent this distinction is academic:  Even though Defendants violated the FLSA in 2013 and 2014, the Court is awarding *damages* to Plaintiffs under the NYLL (and not the FLSA) for *all* of the years at issue in this case.

*England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)).  An employee discharges his burden at this first step "if he ... can prove that [he] 'in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'"  *Hernandez* v. *Jrpac Inc.*, No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *27 (S.D.N.Y. June 9, 2016) (quoting *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  "This burden is 'not high' and may be met 'through estimates based on [the employee's] own recollection.'"  *Id.* (quoting *Kuebel*, 643 F.3d at 362).

If an employee makes this showing, "[t]he burden then shifts to the employer to come forward [i] with evidence of the precise amount of work performed or [ii] with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Jrpac*, 2016 WL 3248493, at *27 (quoting *Anderson*, 328 U.S. at 687-88).  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate."  *Gonzalez*, 2017 WL 3835960, at *16 (quoting *Kuebel*, 643 F.3d at 362).

*NYLL*:  "A similar standard applies to unpaid compensation claims under [the] NYLL."  *Gonzalez*, 2017 WL 3835960, at *16; *see Garcia* v. *JonJon Deli Grocery Corp.*, No. 13 Civ. 8835 (AT), 2015 WL 4940107, at *4 & n.8 (S.D.N.Y. Aug. 11, 2015) ("Courts use the same burden-shifting framework to determine liability for unpaid overtime under the NYLL [and the FLSA].").  But under the NYLL, an employer who fails to keep accurate records shoulders a more

23

stringent burden of proof.  "NYLL § 196-a provides that where an employer fails to 'keep adequate records or provide statements of wages to employees as required' by the statute, the employer 'shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements.'" *Canelas* v. *World Pizza, Inc.*, No. 14 Civ. 7748 (ER), 2017 WL 1233998, at *9 (S.D.N.Y. Mar. 31, 2017) (quoting NYLL § 196-a(a)).

By its terms, the NYLL — unlike the FLSA — does not permit an employer to discharge this burden by undermining the reasonableness of an employee's evidence that he was underpaid.  *Cf. Jrpac*, 2016 WL 3248493, at *27.  The NYLL is more demanding:  An employer must demonstrate that it in fact paid its employees "wages, benefits, and supplements."  NYLL § 196-a(a).  And "[i]f an employer cannot satisfy its burden under the FLSA, it cannot satisfy th[is] 'more demanding burden' of the NYLL."  *Canelas*, 2017 WL 1233998, at *9 (quoting *Doo Nam Yang* v. *ACBL Corp.*, 427 F. Supp. 2d 327, 337 n.15 (S.D.N.Y. 2005)).

*** 

Although these two burden-shifting schemes impose similar requirements, an employee "may not receive a 'double recovery' of back wages under both the FLSA and [the] NYLL."  *Jrpac*, 2016 WL 3248493, at *31 (quoting *Gen. Tel. Co. of the Nw.* v. *EEOC*, 446 U.S. 318, 333 (1980)); *accord Hengjin Sun* v. *China 1221, Inc.*, No. 12 Civ. 7135 (RJS), 2016 WL 1587242, at *2 (S.D.N.Y. Apr. 19, 2016) ("The law in this Circuit is clear:  'Obviously, plaintiffs are not entitled to recover twice' under both the FLSA and NYLL 'for

24

the same injury.'" (quoting *Cao* v. *Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ.

3725 (DC), 2010 WL 4159391, at *2 n.2 (S.D.N.Y. Sept. 30, 2010))).  If "'a

plaintiff is entitled to damages under both federal and state wage law,' the

Court has discretion to award [that plaintiff] damages under the statute

providing the greatest amount of relief."  *China 1221*, 2016 WL 1587242, at *2

(quoting *Jiao* v. *Shi Ya Chen*, No. 03 Civ. 165 (DF), 2007 WL 4944767, at *17

(S.D.N.Y. Mar. 30, 2007)); *see Jrpac*, 2016 WL 3248493, at *31 (awarding

plaintiffs damages under the NYLL, not the FLSA, because the NYLL's "higher

minimum wage" and longer statute of limitations meant that "[p]laintiffs'

damages award under the NYLL necessarily … subsume[d] their award under

the FLSA").[7]

Against the backdrop of these FLSA and NYLL burden-shifting schemes,

the Court turns to the central legal question in this case:  What is an employer

legally required to pay her employees?  The answer involves several steps.

Below, the Court addresses (i) what constitutes minimum wage and overtime

under the FLSA and the NYLL, (ii) when meal breaks are not compensable

---

[7]    The FLSA and the NYLL have different statutes of limitations, but the difference is not
material in this case.  The FLSA's statute of limitations "is two years," or three if an
employer willfully violated the statute.  *E.g., McLean* v. *Garage Mgmt. Corp.*, No. 09 Civ.
9325 (DLC), 2012 WL 1358739, at *7 (S.D.N.Y. Apr. 19, 2012); *see* 29 U.S.C. § 255(a).
The NYLL's statute of limitations is six years.  NYLL § 663(3).  Plaintiffs filed the
Complaint on April 7, 2015.  (Dkt. #1).  Any NYLL violations Defendants committed on
or after April 7, 2009 (which was before Koo hired any of the Plaintiffs) are actionable.
The FLSA, in contrast, would at most reach back to April 7, 2012.   Plaintiffs' NYLL
damages are thus greater than their FLSA damages.

To be clear, Defendants violated the FLSA *and* the NYLL when they underpaid Plaintiffs.
Plaintiffs are entitled to relief for their First and Second Causes of Action (which seek
relief under the FLSA) as well as their Third, Fourth, and Fifth (which arise under the
NYLL).  But as far as the quantum of damages is concerned, Plaintiffs will recover under
the NYLL alone.

under these two statutes; (iii) the NYLL's spread-of-hours requirement; (iv) the requirements an employer must fulfill to deduct a tip credit from her employees' wages; (v) the requirements an employer must fulfill to deduct a meal credit from her employees' wages; and (vi) when an employee is entitled to recover liquidated damages under the FLSA and the NYLL.

### a.   Minimum Wage and Overtime

At all times relevant to this lawsuit, the FLSA mandated that employees receive a $7.25 per hour minimum wage.  29 U.S.C. § 206(a)(1)(C).   Minimum wage under the NYLL was also $7.25 until December 31, 2013, when it increased to $8.00, and it increased again to $8.75 on December 31, 2014.  NYLL § 652(1).

Both the FLSA and the NYLL also require employers to pay overtime.  The requirement under both statutes is the same:  Once an employee works 40 hours in a week, he must be paid "one and one-half times [his] regular rate" for all excess hours.  *Dejesus* v. *HF Mgmt. Servs., LLC*, 726 F.3d 85, 88 (2d Cir. 2013) (quoting 29 U.S.C. § 207(a)(1)) (FLSA); *Salustio* v. *106 Columbia Deli Corp.*, — F. Supp. 3d —, No. 15 Civ. 6857 (GWG), 2017 WL 3736695, at *10 (S.D.N.Y. Aug. 30, 2017) (NYLL).

### b.   Non-Compensable Meal Breaks

"Under both the FLSA and NYLL, 'all of the time worked during a continuous workday is compensable, save for bona fide meal breaks.'"  *Jrpac*, 2016 WL 3248493, at *27 (quoting *Hart* v. *Rick's Cabaret Int'l, Inc.*, 60 F. Supp. 3d 447, 476 n.15 (S.D.N.Y. 2014)); *see also Perkins* v. *Bronx Lebanon Hosp.*

26

*Ctr.*, No. 14 Civ. 1681 (JCF), 2016 WL 6462117, at *3 n.6 (S.D.N.Y. Oct. 31, 2016) ("The NYLL incorporate[s] [the] FLSA['s] standards for determining whether time worked is compensable time." (internal quotation marks and citation omitted)).

"To qualify as a bona fide meal period, '[t]he employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period.'" *Salinas*, 123 F. Supp. 3d at 472 (quoting 29 C.F.R. § 785.19(a)). Conversely, an "employee is not relieved if he is required to perform any duties, whether active or inactive, while eating." 29 C.F.R. § 785.19(a). Moreover, "[r]est periods of short duration, running from 5 minutes to about 20 minutes … are customarily paid for as working time." *Id.* § 785.18.

### c.     The NYLL's Spread-of-Hours Requirement

Under New York law, an employee's "spread of hours is the length of the interval between the beginning and end of an employee's workday." N.Y. Comp. Codes R. & Regs. tit. 12 ("12 N.Y.C.R.R."), § 146-1.6. The "NYLL requires employers to pay an employee who works a spread of hours in excess of ten an additional hour at the minimum wage rate." *Pineda* v. *Tokana Cafe Bar Restorant Inc.*, No. 16 Civ. 1155 (JPO), 2017 WL 1194242, at *3 (S.D.N.Y. Mar. 30, 2017).

"Before January 1, 2011," New York employers were required to pay "spread-of-hours wages only [to] employees who were paid at the minimum wage." *Villar* v. *Prana Hosp., Inc.*, No. 14 Civ. 821 (JCF), 2017 WL 1333582, at

27

*4 (S.D.N.Y. Apr. 11, 2017).  But "[e]ffective January 1, 2011, employers are required to pay spread-of-hours wages for 'all employees in restaurants and all-year hotels, regardless of a given employee's regular rate of pay.'" *Id.* (quoting 12 N.Y.C.R.R. § 146-1.6(d)).

### d.    Tip Credit

"Both the FLSA and the NYLL permit an employer to pay a tipped worker a cash wage that is lower than the statutory minimum wage, provided that the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage." *Inclan* v. *N.Y. Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 497 (S.D.N.Y. 2015).  "This allowance against the minimum cash wage is known as a 'tip credit.'" *Id.*

The requirements an employer must fulfill to claim a tip credit differ slightly under the FLSA and the NYLL.  The Court considers each statute in turn:

*FLSA*:  "The FLSA's definition of 'wage' provides that, under certain circumstances, employers of 'tipped employees' may apply part of such employees' tips towards that minimum wage." *Trinidad* v. *Pret A Manger (USA) Ltd.*, 962 F. Supp. 2d 545, 560 (S.D.N.Y. 2013) (quoting 29 U.S.C. § 203(m)). The FLSA defines a "[t]ipped employee" as "any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips." 29 U.S.C. § 203(t).  "When deciding whether an employee customarily and regularly receives tips, courts must determine whether the employee's job is historically a tipped occupation and whether he has more

28

than '*de minimis*' interaction with customers as a part of his employment."
*Salinas*, 123 F. Supp. 3d at 467 (quoting *Chhab* v. *Darden Rests., Inc.*, No. 11
Civ. 8345 (NRB), 2013 WL 5308004, at *6 (S.D.N.Y. Sept. 20, 2013)).  And
when "an employee performs both tipped and untipped work, the question of
whether an employer is entitled to apply a tip credit for minimum wage
purposes turns on whether the employee spends more than twenty percent of
his or her workweek performing non-tipped work.  If so, the employer is not
entitled to apply a tip credit, and must pay that employee the full minimum
wage."  *Islam* v. *BYO Co. (USA)*, No. 16 Civ. 927 (PGG), 2017 WL 2693717, at *4
(S.D.N.Y. June 20, 2017).

To avail himself of the FLSA's tip credit, an employer must comply with
two additional statutory requirements.  "The FLSA provides that the tip credit
'shall not apply with respect to any tipped employee unless [i] such employee
has been informed by the employer of the [statute's tip credit] provisions, and
[ii] all tips received by such employee have been retained by the employee.'"
*Jrpac*, 2016 WL 3248493, at *23 (quoting 29 U.S.C. § 203(m)).   This first
requirement — the "notice provision" — "is strictly construed and normally
requires that an employer take affirmative steps to inform affected employees of
the employer's intent to claim the tip credit."  *Inclan*, 95 F. Supp. 3d at 497
(quoting *Perez* v. *Lorraine Enters., Inc.,* 769 F.3d 23, 27 (1st Cir. 2014)).

"The employer bears the burden of showing that it satisfied the notice
requirement 'by, for example, providing employees with a copy of § 203(m) and
informing them that their tips will be used as a credit against the minimum

29

wage as permitted by law.'" *Cucu* v. *861 Rest. Inc.*, No. 14 Civ. 1235 (JGK), 2017 WL 2389694, at *3 (S.D.N.Y. June 1, 2017) (quoting *Copantitla* v. *Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 288 (S.D.N.Y. 2011)).  However, "[t]he FLSA's notice provision does not require that the notice be given in writing." *Jrpac*, 2016 WL 3248493, at *23.  "If the employer cannot show that it has informed employees that tips are being credited against their wages, then no tip credit can be taken and the employer is liable for the full minimum[ ]wage[.]" *Inclan*, 95 F. Supp. 3d at 497 (citation omitted); *see Copantitla*, 788 F. Supp. 2d at 288 (restaurant not entitled to take tip credit despite "informing employees that they would receive an hourly rate plus tips" and "posting notices about the minimum wage laws," because restaurant did not "t[ell] its employees that it intended to use tips to satisfy its minimum wage obligations").

 *NYLL*:  "The NYLL allows an employer to take a tip credit for tipped employees, subject to certain conditions similar to those under the FLSA." *Jrpac*, 2016 WL 3248493, at *25; *see* 12 N.Y.C.R.R. § 146-1.3 ("An employer may take a credit towards the basic minimum hourly rate if a service employee or food service worker receives enough tips and if the employee has been notified of the tip credit[.]").  But there is a critical distinction between the NYLL's notice provision and the FLSA's:  "Notice of the tip credit under the NYLL … must be written." *Jrpac*, 2016 WL 3248493, at *25.  Thus, "[p]rior to the start of employment, an employer shall give each employee written notice of … the amount of tip credit, if any, to be taken from the basic minimum

hourly rate …  The notice shall also state that extra pay is required if tips are insufficient to bring the employee up to the basic minimum hourly rate."  12 N.Y.C.R.R. § 146-2.2(a).  And this notice must be written in both English and "any other language spoken by the new employee as his/her primary language."  *Id.* § 146-2.2(a)(1)-(2).  Moreover, once an employer has provided written notice of this tip credit, the employer must obtain "acknowledgement of receipt signed by the employee," and that signed acknowledgement must "be kept on file for six years."  *Id.* § 146-2.2(c).

"The burden is on the [employer] to show that [it has] complied with the [NYLL's] tip notice requirement."  *Salustio*, 2017 WL 3736695, at *10 (quoting *Valle* v. *Gordon Chen's Kitchen LLC,* — F. Supp. 3d —, No. 15 Civ. 2005 (GWG), 2017 WL 2438571, at *6 (S.D.N.Y. June 6, 2017)).  "An employer who fails to provide the required notice is liable for the difference between the full minimum wage rate and what the employee was actually paid."  *Id.*

### e.    Meal Credit

The FLSA and the NYLL also allow employers to deduct the cost of certain meals from their employees' wages.  Here too, the requirements under each statute differ, so the Court will consider them separately:

*FLSA*:  "Under the FLSA, an employee's wage 'includes the reasonable cost … to the employer of furnishing such employee with board … if such board … [is] customarily furnished by such employer to his employees."  *Jrpac*, 2016 WL 3248493, at *26 (quoting 29 U.S.C. § 203(m)).  "However, the meal credit's 'reasonable cost' may 'not [be] more than the actual cost,' … and 'the

31

employer must retain records documenting the out-of-pocket costs that it incurred[.]'" *Id.* (quoting 29 C.F.R. § 531.3(a); *Ke* v. *Saigon Grill, Inc.*, 595 F. Supp. 2d 240, 256-57 (S.D.N.Y. 2008)).  "The employer 'bears the burden of proving both the actual costs [of the meal] and their reasonableness.'" *Id.* (quoting *Saigon Grill*, 595 F. Supp. 2d at 257).

*NYLL*:  In New York, "[m]eals … provided by an employer to an employee may be considered part of the wages paid to the employee but shall be valued at no more than … $2.50 per meal."  *Jrpac*, 2016 WL 3248493, at *26 (quoting 12 N.Y.C.R.R. § 146-1.9).  And such a meal must consist of "adequate portions of a variety of wholesome, nutritious foods and … include at least one of the types of food from all four of the following groups: [i] fruits or vegetables; [ii] grains or potatoes; [iii] eggs, meat, fish, poultry, dairy, or legumes; and [iv] tea, coffee, milk or juice."  12 N.Y.C.R.R. § 146-3.7.  If an employer cannot prove that the meals it provided its employees satisfied these nutritional requirements, it cannot claim a meal credit.  *See Romero* v. *Anjdev Enterps., Inc.*, No. 14 Civ. 457 (AT), 2017 WL 548216, at *10 (S.D.N.Y. Feb. 10, 2017); *see also Jrpac*, 2016 WL 3248493, at *27 (noting that 12 N.Y.C.R.R. § 146-3.7's "definition of meal … contains mandatory language").

### f.   Liquidated Damages

Finally, the Court considers when an employee may obtain liquidated damages under the FLSA and the NYLL:

*FLSA*:  "'Under the FLSA, a district court is generally required to award a plaintiff liquidated damages equal in amount to actual damages' for violations

of the FLSA's minimum wage and overtime provisions." *Inclan*, 95 F. Supp. 3d at 504 (quoting *Barfield* v. *N.Y.C. Health & Hosps. Corp.,* 537 F.3d 132, 150 (2d Cir. 2008)).  The statute provides that an employer who commits wage-and-hour violations "shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).

Courts have "discretion to deny liquidated damages where [an] employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing that its acts or omissions did not violate the FLSA."  *Barfield*, 537 F.3d at 150 (quoting 29 U.S.C. § 260).  But this is a tough row to hoe.  "To establish the requisite subjective 'good faith,' an employer must show that it took active steps to ascertain the dictates of the FLSA and then act to comply with them."  *Jrpac*, 2016 WL 3248493, at *33 (quoting *Hart* v. *Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 938 (S.D.N.Y. 2013)).  And an employer will not escape paying liquidated damages under the FLSA unless he establishes that he acted in good faith and in an objectively reasonable way "by plain and substantial evidence." *Id.* (internal quotation marks omitted) (quoting *Moon* v. *Kwon*, 248 F. Supp. 2d 201, 234 (S.D.N.Y. 2002)).

*NYLL*:  The NYLL's liquidated damages provision changed in two ways during the time period when Plaintiffs worked at Koodo Sushi.  The first change, which took effect on November 24, 2009, altered the burden of proof

33

and mental-state requirement of this provision.  *See China 1221*, 2016 WL
1587242, at *3.  The second, "effective April 9, 2011," increased the liquidated
damages an NYLL plaintiff can recover from 25% of his unpaid wages to 100%.
*Id.*  Neither amendment applies retroactively.  *See McLean* v. *Garage Mgmt.
Corp.*, No. 09 Civ. 9325 (DLC), 2012 WL 1358739, at *9-10 (S.D.N.Y. Apr. 19,
2012).  The Court considers each amendment in turn.

   November 24, 2009:  Before November 24, 2009, an employee could
recover 25% "liquidated damages under the NYLL only if that employee could
prove that the employer's failure to pay the wage required by [[A]rticle 6 of the
NYLL] was willful."  *Inclan*, 95 F. Supp. 3d at 504 (internal quotation marks
and citation omitted).  The NYLL's definition of willfulness mirrored the FLSA's:
An employer "willfully violate[d] the [NYLL] [if] it either knew or showed reckless
disregard for ... whether its conduct was prohibited by the" NYLL.  *Kuebel*, 643
F.3d at 366 (internal quotation marks and citation omitted) (providing this
definition of willfulness in discussing the FLSA, and noting that court below
"reasonably concluded ... that the NYLL's willfulness standard does not
appreciably differ" (internal quotation marks and citation omitted)); *see Inclan*,
95 F. Supp. 3d at 504-05.

   But on November 24, 2009, the NYLL was amended to reverse and
augment the burden.  *See, e.g.*, *Galeana* v. *Lemongrass on Broadway Corp.*,
120 F. Supp. 3d 306, 317 (S.D.N.Y. 2014).  From that date forward, "the
NYLL ... removed the requirement of willfulness, so as ... to provide, like the
FLSA, than an employee is entitled to liquidated damages except where the

34

*employer* demonstrates its good faith." *Jrpac*, 2016 WL 3248493, at *34 (emphasis added); *see* NYLL § 663(1). "[C]ourts have not substantively distinguished the [FLSA's] standard from the current [NYLL] standard of good faith." *Inclan*, 95 F. Supp. 3d at 505.

April 9, 2011: "Prior to April 9, 2011, … liquidated damages under the NYLL were calculated at [25%] of the lost pay." *Begum* v. *Ariba Disc., Inc.*, No. 12 Civ. 6620 (DLC), 2015 WL 223780, at *2 (S.D.N.Y. Jan. 16, 2015). An April 9, 2011 amendment to the NYLL "authorized liquidated damages amounting to 100% of the total unpaid wages for violations" occurring after that date. *China 1221*, 2016 WL 1587242, at *3.

Because of the November 24, 2009 and April 9, 2011 amendments to the NYLL, its liquidated-damages provision is very similar to the FLSA's. But a plaintiff cannot simultaneously recover liquidated damages under both statutes. *Chowdhury* v. *Hamza Express Food Corp.*, 666 F. App'x 59, 60-61 (2d Cir. 2016) (summary order). A number of judges in this District have held otherwise. *See, e.g., Tapia*, 2016 WL 4581341, at *7 (noting intra-District disagreement but, "[w]ithout opining on the appropriate rule for earlier time periods," concluding that a plaintiff cannot recover double liquidated damages "for periods after April 9, 2011").[8] But that approach does not hold water in light of the 2009 and 2011 amendments to the NYLL. *See Inclan*, 95 F. Supp.

---

[8]     This Court also need not opine on whether courts can stack liquidated damages for overlapping NYLL and FLSA violations that predate April 9, 2011. At most, the FLSA's statute of limitations stretches back three years. 29 U.S.C. § 255(a). Plaintiffs filed the Complaint on April 7, 2015. (Dkt. #1). They cannot recover *any* damages under the FLSA — let alone liquidated damages — for Defendants' pre-April 9, 2012 conduct.

3d at 504-06.  As things stand after those amendments, both statutes call for

100% liquidated damages when an employer fails to show good-faith

compliance with wage-and-hour laws.  *Id.* at 505-06.  In turn, awarding

stacked liquidated damages under the FLSA and the NYLL "would amount to

an impermissible double recovery."  *Jrpac*, 2016 WL 3248493, at *35.

### 2.    Analysis

That lengthy account of FLSA and NYLL principles should make plain

that this Court must consider many factors to determine whether Defendants

underpaid Plaintiffs.  The Court concludes that Defendants did — but to a far

lesser degree than Plaintiffs claim.  To explain this conclusion, the Court will

begin by addressing several issues common to all Plaintiffs, then calculate the

damages that each Plaintiff sustained.

The Court begins with the burden-shifting scheme common to FLSA and

NYLL claims.  When an employer fails to maintain accurate records, a plaintiff

must proffer "sufficient evidence from which violations of the [FLSA and the

NYLL] and the amount of an award may be reasonably inferred."  *Gonzalez*,

2017 WL 3835960, at *16 (internal quotation marks and citation omitted);

*Garcia*, 2015 WL 4940107, at *4 & n.8.  Such is the case here.  Defendants did

not maintain accurate records of Plaintiffs' hours and wages.  Tellingly,

Defendants' argument in their post-trial brief centers on this burden-shifting

scheme, which only comes into play when an employer's records are deficient.

(*See* Def. Br. 22).  And Plaintiffs proffered sufficient evidence from which the

Court could infer violations of the FLSA and the NYLL.  All three testified that

36

they were systematically underpaid for the hours they worked at Koodo Sushi. The Court — conscious of the fact that an employee's burden at this first stage "is 'not high,'" *Jrpac*, 2016 WL 3248493, at *27 (quoting *Kuebel*, 643 F.3d at 362) — concludes that Plaintiffs made an initial showing that Defendants violated the FLSA and the NYLL.

That shifted the burden to Defendants. The FLSA required Defendants "to come forward [i] with evidence of the precise amount of work performed or [ii] with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Jrpac*, 2016 WL 3248493, at *27 (quoting *Anderson*, 328 U.S. at 687-88). The NYLL, in contrast, placed on Defendants "the burden of proving that [Plaintiffs were] paid wages, benefits and wage supplements." NYLL § 196-a.

Defendants satisfied these burdens — in part. Through their payroll records and Koo's testimony, Defendants established that Plaintiffs inflated their hours and underestimated their pay. There are detailed records (most importantly, the Aldelo Pay Out Details Report and Koo's calendar) that show the wages Plaintiffs received, and those records span nearly all of the years Plaintiffs worked at Koodo Sushi. Those records show that Plaintiffs were paid by the hour, not the week. And in the main, those records demonstrate that Koo paid Plaintiffs wages that satisfied the FLSA and the NYLL.

To be sure, crediting Defendants' records requires the Court to make more than one inferential leap. The Aldelo Pay Out Details Report shows how much Koo paid Plaintiffs, but not how many hours they worked. Likewise, the

37

calendar shows what Koo paid Sanchez and Mastranzo, but provides few details about their hours. These payment amounts, however, are remarkably consistent with Koo's recollections of Plaintiffs' work schedules and the salaries she agreed to pay them. Conversely, the payment amounts are remarkably *in*consistent with Plaintiffs' recollections of their wages and hours.

Why, then, are Plaintiffs entitled to recover any damages? There are three reasons. *First*, Defendants' records are incomplete. Again, there is no single document that demonstrates the wages Plaintiffs earned *and* the hours they worked. Defendants' records make clear that for many weeks, spanning many years, Plaintiffs earned more than minimum wage under the FLSA and the NYLL. But the Court cannot make that determination for *every week* Plaintiffs worked at Koodo Sushi, in part because Defendants' records are incomplete. And the Court will construe any gaps in those records against Defendants.

*Second*, Defendants were not entitled to take tip credits from Plaintiffs' wages under the FLSA or the NYLL. Defendants did not comply with either statute's notice requirement. The FLSA required Defendants to notify Plaintiffs of § 203(m)'s tip-credit provision, and the Court must "strictly construe[ ]" this requirement against Defendants. *Inclan*, 95 F. Supp. 3d at 497 (citation omitted). At most, Koo told Plaintiffs that she would be deducting a set "tip credit" from their hourly wages. Koo did not testify (and the Court does not believe) that she communicated to Plaintiffs that any tips they received would "be[ ] credited against their wages" in order to achieve minimum wage. *Id.*

38

(citation omitted).  And Koo plainly did not comply with the NYLL's tip-credit provision, which required Koo (i) to give Plaintiffs "*written* notice of the" tip credit in English and Spanish, and (ii) to obtain a signed acknowledgement from each Plaintiff and retain it "for six years."  12 N.Y.C.R.R. § 146-2.2(a), (c) (emphasis added).

*Third*, Defendants were not allowed to deduct meal credits from Plaintiffs' wages under the FLSA or the NYLL.  The FLSA required Koo to maintain records cataloguing the costs of the meals she provided to Plaintiffs.  *Jrpac*, 2016 WL 3248493, at *26.  Koo did not do so.  And the NYLL required Koo to adhere to set nutritional guidelines for the food she served Plaintiffs. 12 N.Y.C.R.R. § 146-3.7.  Here too, there is no evidence that Koo complied.

The upshot of these three deficiencies in Defendants' case is that Defendants have largely, but not fully, discharged their burdens under the FLSA and the NYLL.  There were many weeks when Defendants paid Plaintiffs less than minimum wage (and corresponding overtime) under the FLSA and the NYLL, given that Defendants could not deduct meal or tip credits from Plaintiffs' wages.  And for many weeks, the Court cannot determine what (or if) Defendants paid Plaintiffs because of the gaps in Defendants' records.

For these reasons, the Court must "award damages to [Plaintiffs], even though the result may be only approximate."  *Gonzalez*, 2017 WL 3835960, at *16 (internal quotation mark and citation omitted).  Because Plaintiffs are entitled to greater damages under the FLSA than the NYLL, the Court will award them damages under the state statute.  *China 1221*, 2016 WL 1587242,

at *2 (citation omitted).  The Court begins with Sanchez, turns to Mastranzo, and concludes with Gamero. [9]

### a.   Sanchez

Sanchez is entitled to recover $2,311.58 in unpaid wages (i.e., in actual damages), plus $972.43 in liquidated damages.  The Court considers each category of damages in turn:

*Actual Damages*:  To reach this figure, the Court began by considering the minimum legal payments Sanchez was due under the NYLL, as set forth in Defendants' Findings of Fact and Conclusions of Law.  (Def. FFCL ¶¶ 260, 263, 265).  Defendants' arithmetic checked out:  These figures accounted for the hours Sanchez worked throughout his tenure at Koodo Sushi (based on his usual schedule of 50 hours per week), and took account of prevailing NYLL minimum-wage rates.  Defendants also correctly assumed that Sanchez worked overtime, and took non-compensable lunch and dinner breaks.  Defendants calculated that Sanchez was owed: (i) $340.49 per week during his first month at Koodo Sushi; (ii) $347.69 per week from his second month on the job through December 31, 2013; and (iii) $383.75 per week from January 1, 2014, through the end of 2014.  (*Id.*).[10]

---

[9]     To be clear:  Plaintiffs all proved the Complaint's First and Third Causes of Action, which arise under the FLSA's minimum-wage requirement and the NYLL's, respectively. Sanchez and Mastranzo prevail under the Complaint's Second and Fourth Causes of Action (for overtime violations) and its Fifth Cause of Action (for Defendants' spread-of-hours violations).  Gamero never worked overtime, and never worked more than 10 hours in one day.

[10]    Defendants did not calculate Sanchez's 2015 damages.  But at trial, Sanchez conceded (perhaps unwittingly) that he is not entitled to damages for the work he performed in January 2015 and February 2015.  Sanchez testified that he worked a "half time" schedule after December 2014, and continued to work half-time through the end of his

But Defendants' calculations assumed that Koo was entitled to deduct meal and tip credits from Sanchez's wages.  (Def. FFCL ¶¶ 260, 263, 265).  She was not.  And once the Court removed those credits from Defendants' calculations, it determined that the *actual* minimum payments Koo owed Sanchez were:  (i) $375.19 per week during his first month at Koodo Sushi; (ii) $375.19 per week from his second month through December 31, 2013; and (iii) $414.00 per week from January 1, 2014, through the end of 2014.[11] Where Defendants' records established that Sanchez worked less than his standard 50 hours in a week, the Court recalculated what Sanchez was due based on this more limited schedule.

The Court then compared these minimum payments to the actual payments Sanchez received throughout his tenure at Koodo Sushi.  Here, too, the Court built off of Defendants' assiduous spade work.   Appendix A to Defendants' Findings of Fact and Conclusions of Law is a spreadsheet of Sanchez's and Mastranzo's wage payments.  (Def. FFCL, app. A).  The Court reviewed every entry, cross-checking each one against Defendants' records (mostly, Koo's calendar and the Aldelo Pay Out Details Report).  When

---

employment at Koodo Sushi.  (Tr. 29).   During this period, Sanchez claimed that he worked from 11:00 a.m. to 3:00 p.m., "Monday through Friday" — a total of 20 hours per week.  (*Id.* at 25, 40).  Sanchez further claimed that Defendants paid him $300.00 per week during this period.  (*Id.* at 29).  Even assuming Sanchez was owed $8.75 per hour (New York's 2015 minimum wage), and even assuming that he took no meal breaks, Defendants owed Sanchez $175.00 per week — less than what Sanchez claims Defendants actually paid him.

[11]   In calculating the minimum weekly payment Sanchez was owed throughout 2014, Defendants assumed that he worked 50 hours per week.  (Def. FFCL ¶ 265).  The Court made the same assumption when it calculated what Sanchez was *actually* due in 2014 — even though Sanchez, by his own account, was working "half time" in December 2014.  (Tr. 25, 27).

those records were ambiguous — for example, when Koo's handwriting was illegible — the Court construed those ambiguities against Defendants and assumed that Defendants paid Sanchez what he claimed he earned: (i) $350.00 per week between the start of his employment until August 2011 (Tr. 27); (ii) $375.00 per week between August 2011 through the end of 2011 (*id.* at 27-28); and (iii) $500.00 per week throughout 2012 and 2014 (*id.* at 28).

In the vast majority of weeks, Defendants paid Sanchez more than the minimum he was owed under the NYLL. But in some weeks, Defendants paid him less. The Court aggregated the damages Sanchez sustained for all the weeks in which Defendants paid him less than minimum wage. Pursuant to these calculations, the Court determined that Defendants underpaid Sanchez by $2,311.58.

*Liquidated Damages*: The Court also concludes that Sanchez is entitled to liquidated damages under the NYLL. Sanchez's tenure at Koodo Sushi spanned both the November 24, 2009 and April 9, 2011 amendments to the NYLL. And in turn, to determine what liquidated damages Sanchez can recover, the Court must consider whether Defendants acted willfully and/or demonstrated good faith, and must also calculate Sanchez's liquidated damages based on both the 25% (pre-April 9, 2011) and 100% (April 9, 2011, and thereafter) rates.

The Court begins with the mental-state question prompted by the November 24, 2009 amendment to the NYLL. Prior to that date, an employee could recover liquidated damages for unpaid wages "only if th[at] employee

could prove that the employer's failure to pay the wage required by [[A]rticle 6 of the NYLL] was willful." *Inclan*, 95 F. Supp. 3d at 504 (internal quotation marks and citation omitted).  But beginning on November 24, 2009, the NYLL required *employers* to demonstrate that they acted in good faith in order to avoid paying liquidated damages. *Jrpac*, 2016 WL 3248493, at *34.

Under either standard, Sanchez prevails.  The New York Department of Labor investigated Koodo Sushi for overtime and spread-of-hours violations in 2008, one year before Koo hired Sanchez.  But in spite of this investigation, Koo continued to maintain haphazard and incomplete records.  She deducted meal and tip credits from Sanchez's wages without complying with the NYLL's requirements for taking such credits.  And, critically, she did not maintain — and to date, has not instituted — a method to track accurately her employees' hours.  Those were willful violations of the NYLL:  Koo "either knew or showed reckless disregard for the" fact that she was violating the statute. *Kuebel*, 643 F.3d at 366 (citation omitted).  (*See also* Pl. CL ¶¶ 67-74).

And Koo cannot show good faith.  Koo testified that she makes annual efforts to research labor laws.  But her efforts fell far short of compliance — the evidence at trial made plain that Koo did not "act to comply" with the NYLL. *Jrpac*, 2016 WL 3248493, at *33 (citation omitted).  Sanchez can thus recover liquidated damages for unpaid wages throughout the entirety of his tenure at Koodo Sushi, both before and after November 24, 2009.  And this conclusion applies with equal force to Mastranzo and Gamero:  They too may recover liquidated damages under the NYLL.

43

In light of the April 9, 2011 amendment to the NYLL, the Court calculated Sanchez's liquidated damages as follows.  Using the calculations the Court explained *supra*, it determined that before April 9, 2011, Defendants underpaid Sanchez by $1,785.53.  He can recover 25% of that figure — $446.38 — in liquidated damages.  Defendants underpaid Sanchez by $526.05 between April 9, 2011, and the end of his employment at Koodo Sushi; he can recover exactly that amount in liquidated damages, too.  Sanchez's total liquidated damages are $972.43.

### b.    Mastranzo

The Court followed a nearly identical process to calculate Mastranzo's damages, although this math proved easier.  Defendants underpaid Mastranzo by $3,668.07, and Mastranzo may recover $2,915.04 in liquidated damages.

*Actual Damages*:  Defendants argued that Mastranzo's minimum salary was:  (i) $340.49 per week from the time he started at Koodo Sushi until December 31, 2013, and (ii) $373.43 per week between January 1, 2014, and December 31, 2014.  (Def. FFCL ¶¶ 252, 255).  After recalculating these wages to remove tip and meal credits, the Court concluded that Mastranzo was actually owed (i) $375.19 per week from the time he started at Koodo Sushi until December 31, 2013, and (ii) $414.00 per week between January 1, 2014, and December 31, 2014.  The Court then compared these figures to the actual wages Mastranzo received.  And here as well, when Defendants' records proved ambiguous, the Court assumed that Mastranzo was paid the wages he alleged Defendants paid him:  (i) $350.00 per week from the start of his employment

44

(which Mastranzo claimed was June 2010) until June 2011 (Tr. 72, 74-75); and (ii) $400.00 per week between June 2011 and the end of his tenure at the restaurant (*id.* at 83-85).

Defendants did not offer a method for the Court to assess what Defendants owed Mastranzo in 2015. As far as the Court can determine, there are no records of Mastranzo's wages from that year. Thus, the Court assumed that Defendants paid Mastranzo $400.00 per week (as he claimed), and that he was owed a minimum of $452.81, a rate that accounted for New York's $8.75 minimum wage. In total, the Court calculated that Defendants underpaid Mastranzo by $3,668.07.

*Liquidated Damages*: Before April 9, 2011, Defendants underpaid Mastranzo by $1,004.04, which means he can recover $251.01 (25% of his unpaid wages) in liquidated damages. Thereafter, Defendants underpaid Mastranzo by $2,664.03, for which he can recover equivalent liquidated damages. Mastranzo's total liquidated damages are $2,915.04.

### c.   Gamero

The Court followed a different method to calculate Gamero's damages. Gamero was, by a wide margin, the least credible trial witness. His account of the hours he worked and the wages Defendants paid him was riddled with obvious errors. Defendants thoroughly impeached Gamero — so thoroughly, in fact, that the Court was hard-pressed to conclude that Gamero had discharged his initial burden of demonstrating "the amount and extent of [his

undercompensated] work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687.

But the strongest support for Gamero's argument is found in the evidence Defendants used to impeach Gamero.  Defendants maintained at trial, and persisted to maintain in their post-trial papers, that Koo paid Gamero $5.00 per hour.  (Def. FFCL ¶¶ 87-89).  That rate, Defendants contend, was more than Koo owed Gamero for his work as a delivery worker, once tip and meal credits were deducted from his pay.  (*Id.* at ¶ 87).  The problem is that Koo did not fulfill the NYLL's requirements for deducting tip and meal credits from Gamero's wages.  And it is of no moment that Gamero often earned more than minimum wage once his tips were factored into his pay:  "An employer who" does not comply with the NYLL's requirements for taking a tip credit "is liable for the difference between the full minimum wage rate and what the employee was actually paid."  *Salustio*, 2017 WL 3736695, at *10.

Complicating matters, there are few records that show what Defendants paid Gamero and how much Gamero worked.  The Aldelo Pay Out Details Report is of limited use.  It confirms that Gamero began working for Koodo Sushi in late 2012, but it gives no indication of how many hours Gamero worked.  Gamero does not appear in Koo's calendar.  And although many of the Seamless delivery reports show the hours Gamero worked and the hourly wages Defendants paid him, those reports are few in number, and more than a few are illegible.

46

What the Court is left with, then, is a plaintiff who effectively perjured himself and defendants who concede that they underpaid him.  Defendants paid Gamero less than the NYLL's minimum wage; he is entitled to recover damages.  But the question remains: how much?

The Court answered that question as follows.  It first reviewed the Seamless delivery reports that clearly showed the hours Gamero worked in a given week.  On average, Gamero worked approximately 13 hours during those weeks.  The Court assumed that Gamero took no meal breaks.  All of these Seamless delivery reports confirmed that Koo paid Gamero $5.00 per hour. Extrapolating from these records, the Court inferred that on average, Koo paid Gamero $65.00 per week in hourly wages.  Under the NYLL, Koo was required to pay Gamero a minimum of (i) $94.25 per week between November 2012 and December 31, 2013; (ii) $104.00 per week from January 1, 2014, through December 31, 2014; and (iii) $113.75 per week from January 1, 2015, through the end of April 2015.

The Court then aggregated Gamero's per-week damages (the difference between $65.00 and what his weekly pay should have been) from the start of his employment (late November 2012) through the end (April 2015).  And from that total, the Court eliminated one year of damages, because Gamero did not work at Koodo Sushi for a whole year.  These calculations yielded damages of $2,535.00 for Gamero.

Because Gamero joined Koodo Sushi after April 9, 2011, he may recover an equivalent measure of liquidated damages:  $2,535.00.

**B.  Gamero, But Not Mastranzo or Sanchez, Is Entitled to Recover Damages for Plaintiffs' Sixth Cause of Action, Because Koo Did Not Provide Him with a Wage Notice**

**1.  Applicable Law**

"New York Labor Law section 195(1) requires employers to provide employees with wage notices within ten business days of the start of employment.'" *Kone* v. *Joy Constr. Corp.*, No. 15 Civ. 1328 (LTS), 2016 WL 866349, at *5 (S.D.N.Y. Mar. 3, 2016) (internal quotation marks and citation omitted).  Section 195(1) mandates that "[e]very employer shall ... provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing" several categories of information, including "the regular pay day designated by the employer" and "the physical address of the employer's main office."  NYLL § 195(1)(a).  At all times relevant to this case, "[a]n employee who d[id] not receive a wage notice within 10 business days of his first day of employment [was] entitled to recover $50 for each week of work that the violations occurred, up to a maximum of $2,500."  *Jrpac*, 2016 WL 3248493, at *29.[12]

---

[12]   "By an amendment to the WTPA effective February 27, 2015, employees became entitled to recover wage-notice statutory damages of $50 dollars 'for each work *day* that the violations occurred or continue to occur,' not to exceed $5,000."  *Cabrera* v. *1560 Chirp Corp.*, No. 15 Civ. 8194 (TPG) (DF), 2017 WL 1289349, at *7 (S.D.N.Y. Mar. 6, 2017) (citation omitted), *report and recommendation adopted*, No. 15 Civ. 8194 (TPG) 2017 WL 1314123 (S.D.N.Y. Apr. 6, 2017).   Gamero claims that he worked at Koodo Sushi "until March 2015." (Pl. FF ¶ 8).  But he requests only $2,500.00 for Defendants' violation of Section 195(1), "overlooking the fact that the available penalties for ... wage-notice violations" increased during his employment at Koodo Sushi.  *Cabrera*, 2017 WL 1289349, at *13.  The Court therefore understands that Gamero is not seeking damages for Defendants' post-February 27, 2015 violation of Section 195(1).  *Cf. id.* (awarding plaintiffs more damages than they requested under Section 195(1) in light of February 27, 2015 amendment).

Violations of Section 195(1) did not always result in money damages.  It was not until April 9, 2011, when New York's Wage Theft Prevention Act ("WTPA") took effect, that employers were subject to damages for not providing wage notices.  *See Kim* v. *Kum Gang, Inc.*, No. 12 Civ. 6344 (MHD), 2015 WL 2222438, at *30-31 (S.D.N.Y. Mar. 19, 2015).  As many judges in this District have held, the WTPA does not apply retroactively.  *See id.* at *31 (collecting cases).  Thus, "an employee who began working before the WTPA took effect on April 9, 2011, may not bring a claim for an employer's failure to provide wage notices." *Canelas* v. *A'Mangiare Inc.*, No. 13 Civ. 3630 (VB), 2015 WL 2330476, at *5 (S.D.N.Y. May 14, 2015); *accord Cucu*, 2017 WL 2389694, at *6 ("For plaintiffs hired before the WTPA took effect on April 9, 2011, the failure to provide a wage notice is insufficient to support a WTPA claim because the Second Circuit Court of Appeals has held that the WTPA does not apply retroactively." (citing *Gold* v. *N.Y. Life Ins. Co.*, 730 F.3d 137, 143-44 (2d Cir. 2013))).[13]

---

[13]    Before February 27, 2015, Section 195(1) imposed an additional wage-statement requirement, although it does not affect Plaintiffs' damages.  "[B]eginning April 9, 2011, the WTPA required employers to provide written wage notices [i] at the time of hiring, *and* [ii] on or before February first of each subsequent year of the employee's employment with the employer." *Cabrera*, 2017 WL 1289349, at *6 (emphasis added) (internal quotation marks and citation omitted).  This annual wage-notice requirement was removed from Section 195(1) "effective February 27, 2015." *Id.*; *accord Kum Gang*, 2015 WL 2222438, at *30.

Some courts, although recognizing "that the WTPA does not apply retroactively," have nonetheless awarded damages under Section 195(1) to plaintiffs hired before April 9, 2011, because these plaintiffs did not receive *annual* wage notices on or after February 1, 2012.  *See Inclan*, 95 F. Supp. 3d 490, 501-02.  But that approach overlooks a quirk in the pre-February 27, 2015 version of the NYLL.  Although the statute "extend[ed] [a] private cause of action to employees whose employer[s] fail[ed] to provide [an] initial [wage] notice at their hire," it did *not* create a private cause of action for employees whose employers "fail[ed] to furnish the annual notice in following years." *Yuquilema* v. *Manhattan's Hero Corp.*, No. 13 Civ. 461 (JLC), 2014 WL 4207106, at

### 2.     Analysis

Defendants concede that Gamero may recover $2,500.00 in statutory damages because Koo never provided him a wage notice.  (Def. Br. 40 n.37). But they argue that Mastranzo and Sanchez may not recover damages for Koo's violation of Section 195(1) because they were both hired before April 9, 2011, when the WTPA took effect.  (*Id.* at 39-40).  Whether judged as a standing question or a limitation on damages, Defendants are correct.  Because Sanchez (whom Koo hired in August 2009) and Mastranzo (who came onboard in January 2010) started working at Koodo Sushi before the WTPA's effective date, they may not recover damages under Section 195(1).

### C.     Plaintiffs Are Entitled to Recover Damages for Their Seventh Cause of Action, Because Koo Never Provided Them Wage Statements

### 1.     Applicable Law

Section 195(3) of the New York Labor Law requires employers to "furnish each employee with a statement with every payment of wages, listing" several details, including the employee's "rate or rates of pay."  NYLL § 195(3). Employers who fail to furnish any sort of wage statement are liable under the statute, as are "employers … [who] fail to comply with all of [Section 195(3)'s] enumerated requirements."  *Severino* v. *436 W. L.L.C.*, No. 13 Civ. 3096 (VSB), 2015 WL 12559893, at *9 (S.D.N.Y. Mar. 19, 2015).  Until February 27, 2015,

---

*10-11 (S.D.N.Y. Aug. 20, 2014), *report and recommendation adopted*, No. 13 Civ. 461 (WHP), 2014 WL 5039428 (S.D.N.Y. Sept. 30, 2014); *see* NYLL § 198 (1-b) (2012); *Salustio*, 2017 WL 3736695, at *11.

The NYLL's annual wage-notice requirement, then, was a right without a remedy.  And this means that even if Plaintiffs did not receive annual wage notices on, for example, February 1, 2013, they cannot recover damages for that violation of Section 195(1).

an employer's failure to provide proper wage statements "was a violation for which plaintiffs could receive $100 per work week in damages, with a cap of $2500." *Jrpac*, 2016 WL 3248493, at *29 (internal quotation mark and citation omitted).[14]

### 2.    Analysis

Defendants concede that Plaintiffs may each recover $2,500.00 because Koo did not provide them wage statements that complied with Section 195(3). (Def. Br. 40 n.37).

### D.    Plaintiffs Are Not Entitled to Relief on Their Eighth Cause of Action, Because They Did Not Need to Purchase Tools of the Trade to Work at Koodo Sushi

### 1.    Applicable Law

"Under the FLSA, an employer may not shift the cost of purchasing 'tools of the trade' to an employee if 'the cost of such tools cuts into the minimum or overtime wages required to be paid him under the [FLSA].'" *Ortega* v. *JR Primos 2 Rest. Corp.*, No. 15 Civ. 9183 (JCF), 2017 WL 2634172, at *3 (S.D.N.Y. June 16, 2017) (quoting 29 C.F.R. § 531.35).  "The same is true under New York law." *Jrpac*, 2016 WL 3248493, at *30; *see* 12 N.Y.C.R.R. § 146-2.7(c) ("If an employee must spend money to carry out duties assigned by his or her

---

[14]    This penalty provision also changed on February 27, 2015.  *Cabrera*, 2017 WL 1289349, at *6.  Since that date, employees have been able "to recover wage-statement statutory damages of $250 dollars for each work *day* that the violations occurred or continue to occur, not to exceed $5,000."  *Id.* (internal quotation marks and citation omitted).  Here too, Gamero ignores this intervening legislative change, and requests only $2,500.00 for Defendants' violation of Section 195(3).  (*See* Pl. CL ¶¶ 100-03; *supra* n.11).  And here again, the Court understands that Gamero does not seek statutory penalties for Defendants' post-February 27, 2015 conduct.

employer, those expenses must not bring the employee's wage below the required minimum wage.").

###   2.   Analysis

Plaintiffs all claim that they "were required to purchase basic necessities in order to do their jobs."  (Pl. CL ¶ 63).  These alleged necessities included: two bicycles Gamero purchased (Pl. FF ¶ 16); a bicycle helmet "and two bicycle lights" for Mastranzo (*id.* at ¶ 29); and "chef's hats ... aprons ... robes ... and a knife" that Sanchez claimed he bought (*id.* at ¶ 45).

The Court did not believe any of this testimony.  *See supra*, n.5.  Koo testified credibly that she did not require Plaintiffs to purchase anything in order to work at Koodo Sushi.  Indeed, Koo provided, among other items, bicycle helmets and lights (Def. FFCL ¶¶ 96, 132-33), knives (*id.* at ¶ 180), and paper hats (*id.* at ¶ 179).  The Court thus rejects Plaintiffs' tools-of-the-trade claim.

### E.   Plaintiffs Are Not Entitled to Relief on their Ninth Cause of Action, Because Koo Did Not Withhold Plaintiffs' Tips

###   1.   Applicable Law

"The NYLL forbids employers from retaining gratuities received by or on behalf of employees."  *Romero*, 2017 WL 548216, at *11.  Section 196-d provides, in relevant part:

> No employer or his agent or an officer or agent of any corporation, or any other person shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee.

NYLL § 196-d.  There is an exception to this prohibition on retaining gratuities

when a customer tips on a credit card:

> When tips are charged on credit cards, an employer is
> not required to pay the employee's pro-rated share of
> the service charge taken by the credit card company for
> the processing of the tip.  The employer must return to
> the employee the full amount of the tip charged on the
> credit card, minus the pro-rated portion of the tip taken
> by the credit card company.

12 N.Y.C.R.R. § 146-2.20.

### 2.   Analysis

Plaintiffs argue that Defendants unlawfully withheld a portion of the tips

they earned on delivery orders placed through Seamless.  (Pl. CL ¶¶ 58-61).  As

Koo testified, Seamless automatically deducts — as a commission —

approximately 14% of tips customers leave when they place orders through the

service.  (Tr. 239).  Defendants retort that they withheld no portion of Plaintiffs'

tips — and that *Seamless* is the only entity that retained any part of the tips

Plaintiffs earned.

Plaintiffs' final cause of action thus reduces to a narrow question:  Does

an employer withhold an employee's tips, within the meaning of NYLL Section

196-d, when an online delivery service retains part of those tips as a

commission?  The Court concludes that the answer is "no."

To start, Plaintiffs' reading of Section 196-d is inconsistent with the

statute's text.  It forbids any "*employer*" from retaining "any part of the

gratuities[ ] received by an *employee*."  NYLL § 196-d (emphasis added).  That

did not happen here.  Koo testified that she would receive payment for orders

53

placed through Seamless one month after those orders were fulfilled.  (Tr. 238-39).  And by the time that money got to Koodo Sushi, Seamless had already taken its commission:  Seamless would remit to Koodo Sushi approximately 86% of the cost of meals and any tips customers left.  (*Id.*).  Koodo Sushi would then give its delivery employees the full amount of the tips the restaurant received from Seamless.  (*Id.* at 239; *see id.* at 240 ("Seamless … would give to me, I give [the employees] the full amount.")).  Defendants — Plaintiffs' employers — retained none of Plaintiffs' tips.

There is scant authority on this subject.  Both parties note that there is an unpublished decision from this District that answers this question differently than this Court has: *Allende* v. *PS Brother Gourmet, Inc.*, No. 11 Civ. 5427 (AJN), 2013 WL 11327098 (S.D.N.Y. Feb. 1, 2013).  (Def. Br. 34; Pl. CL ¶ 60).  *Allende* considered, on summary judgment, whether the service charges a restaurant paid to three online vendors — including Seamless — amounted to an impermissible tip deduction under Section 196-d.  *Allende*, 2013 WL 11327098, at *5-6.  The court concluded that they did.  *Id.* at *6.  Central to *Allende*'s analysis was the "narrow" and "clear" language of 12 N.Y.C.R.R. Section 146-2.20, which permits employers to withhold credit card processing fees from its employees' tips.  *Id.* at *5-6.  The service fees the online delivery services charged "exceed[ed] the cost of liquidating credit card gratuities."  *Id.* at *6.  Seamless, for example, charged a "Marketing Services Fee" as part of its commission.  *Id.*  Thus, *Allende* reasoned, there were genuine fact questions as

54

to whether these service charges amounted to an illegal tip withholding under Section 196-d.  *Id.*

Recognizing both the uncertainty in the law and the difference in the respective factual records, this Court comes to a different conclusion than *Allende*.  Section 146-2.20 deals only with the situation in which an employer must pay a fee to a credit card company in order to process its employees' tips. Although the purposes to which Seamless puts its 14% commission were not discussed at trial, the Court infers that the commission covers more than just credit card processing.  In this sense, Section 146-2.20's text does not save Defendants.

But its rationale does.  Section 146-2.20 recognizes that sometimes, employers need to pay fees to third parties to ensure that their employees receive the tips they've earned.  Instead of requiring employers to refund credit card processing fees to their employees, Section 146-2.20 permits employers to pay employees their tips less necessary processing fees.  Those fees are simply the cost of doing business.

So is Seamless's commission.  Koo explained that she is required to pay Seamless 14% of any money Koodo Sushi earns from deliveries placed through the service.  To ensure that Plaintiffs received their tips, she had to pay Seamless's fee.  *Allende* took issue with the fact that part of Seamless's commission includes marketing fees.  *See Allende*, 2013 WL 11327098, at *6. And part of that commission obviously includes credit card processing fees. But Plaintiffs did not argue — and the Court does not believe — that

55

Seamless's credit card processing fees and non-credit card processing fees can be disaggregated.  They both fall under the umbrella of Seamless's commission; they are both costs of doing business with Seamless.  And in this sense, Section 146-2.20 suggests that Koodo Sushi was under no obligation to refund Plaintiffs for the fees the restaurant needed to pay in order for Seamless to process Plaintiffs' tips.

*Allende* noted (disapprovingly) that Seamless's commission "exceed[ed] the cost of liquidating credit card gratuities."  *Allende*, 2013 WL 11327098.  But that assumes that "liquidating" a credit card tip encompasses only the act of paying a credit card company's processing fee.  On this score, the Court also disagrees.  When a customer orders dinner from Koodo Sushi through Seamless and indicates the amount she wishes to tip, that tip exists in the ether.  Koodo Sushi does not realize the tip until one month after the order is placed, when Seamless gives the restaurant the money the restaurant earned from the customer's Seamless order, less Seamless's commission.  Put another way:  In order to *liquidate* the tips Seamless customers pay Koodo Sushi's delivery employees, Koodo Sushi must pay Seamless's commission.  That commission may be higher than a typical credit card processing fee (although Plaintiffs introduced no evidence to show this is the case).  But in effect, Seamless's commission and credit card processing fees serve the same purpose.

A case that *Allende* discussed, *Myers* v. *The Copper Cellar Corporation*, 192 F.3d 546 (6th Cir. 1999), illustrates this point.  *See Allende*, 2013 WL

11327098, at *5.  Copper Cellar, a Tennessee steakhouse chain, withheld a flat

three percent of tips its customers left on credit cards.  *Myers*, 192 F.3d at 548,

552-53.  Copper Cellar would then use this money to pay credit card

processing fees; the actual fees varied depending on, *inter alia*, the type of

credit card a customer used.  *Id.* at 553.  Appellants, former Copper Cellar wait

staff, argued that this deduction violated Section 203(m) of the FLSA, which

"command[s] that a tipped employee must be permitted to retain all gratuities

received by that employee."  *Id.* at 548, 552.  The Sixth Circuit rejected

appellants' argument.  *Id.* at 555-56.  It concluded "that, as a matter of law, an

employer may subtract a sum from an employee's charged gratuity which

reasonably compensates it for its outlays sustained in clearing that tip."  *Id.* at

553.

 "Before an employee can be entitled to attain any funds on account of a

charged customer gratuity," the *Myers* panel wrote, "that debited obligation

must be converted into cash."  *Myers*, 192 F.3d at 553.  And an "employer,"

*Myers* explained, "has an obvious legal right to deduct the cost of

converting … credited tip[s] to cash," because "[t]he liquidation of [a] restaurant

patron's paper debt to the table server *require[s]* the predicate payment of a

handling fee to the credit card issuer."  *Id.* at 553-54 (emphasis added).

Indeed, the Sixth Circuit even approved of employers deducting "a fixed

composite percentage handling fee" from its employees' tips, so long as that

fixed deduction "did not enrich [the employer]."  *Id.* at 555.

This Court sees no material difference between Seamless's commission and the credit card processing fees *Myers* condoned.  Their effect is the same: Koo paid Seamless a 14% commission in order to "clear[ ]" the tips her employees earned through the service.  *See Myers*, 192 F.3d at 553.  Like a credit card processing fee, Seamless's commission is an unavoidable charge Koodo Sushi must pay before its employees receive their tips.  And the Court finds telling *Myers*'s concern that an employer might "enrich" itself by withholding a percentage of its employees' tips in order to pay credit card fees. *Id.* at 555.  By paying Seamless's 14% commission, Koodo Sushi did not enrich itself at all.  To the contrary, Koo gave her employees the full balance of their tips (less Seamless's commission).

The Court offers one final, but significant, factual point.  Exhibit A to Plaintiffs' Findings of Fact and Conclusions of Law is a detailed breakdown of the wage-and-hour damages Plaintiffs are requesting.  (Pl. FFCL, Ex. A).  But Plaintiffs do not include among those damages any damages claimed as a result of Defendants' alleged violation of Section 196-d.  (*See id.*).  Indeed, Plaintiffs do not provide *any* indication of how much they are seeking for their Ninth Cause of Action.  (*Cf.* Pl. CL ¶ 61 ("[T]he Court should permit damages for all [S]eamless … deductions made against Plaintiffs' wages.")).  Nor have they requested a damages inquest.  Perhaps this was an oversight on Plaintiffs' part — although this seems unlikely, given that Plaintiffs have calculated proposed damages for their other causes of action.  (*Id. at* ¶¶ 106-10; *see* Pl. FF ¶¶ 16, 29, 45 (listing prices of Plaintiffs' claimed "tools of the trade")).  But as

things stand, Plaintiffs have not requested any damages for their Section 196-d claim. The Court therefore considers the claim abandoned.

In sum, the Court concludes that the commissions Defendants paid to Seamless did not amount to an impermissible tip withholding under Section 196-d. Defendants retained none of Plaintiffs' tips.

## F.   Plaintiffs May Recover Prejudgment Interest on Their Unpaid Wages Under the NYLL

### 1.   Applicable Law

"Prejudgment interest may be awarded in addition to liquidated damages under [the] NYLL[.]" *Pineda*, 2017 WL 1194242, at *4; *see* NYLL § 198(1-a). "New York law sets the relevant interest rate at nine percent per year." *Ortega*, 2017 WL 2634172, at *6 (citing N.Y. C.P.L.R. § 5004). And to determine when prejudgment interest begins to accrue, "[c]ourts applying [the] NYLL in wage-and-hour cases 'often choose the midpoint of the plaintiff's employment within the limitations period.'" *China 1221*, 2016 WL 1587242, at *6 (quoting *Tackie* v. *Keff Enters. LLC*, No. 14 Civ. 2074 (JPO), 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16, 2014)).

An NYLL plaintiff may recover prejudgment interest only on his "actual damages ... under the NYLL, ... not [his] liquidated damages." *Ortega*, 2017 WL 2634172, at *6. "Prejudgment interest is [also] not available for violations of the wage statement or wage notice provisions." *Salustio*, 2017 WL 3736695, at *14.

2.    **Analysis**

Plaintiffs are all entitled to recoup prejudgment interest on their unpaid wages under the NYLL:

Sanchez:  Sanchez's actual damages under the NYLL are $2,311.58.  The Court calculates the midpoint of his employment as April 9, 2012.

Mastranzo:  Mastranzo's actual NYLL damages are $3,668.07.  The midpoint of his employment was July 30, 2012.

Gamero:  Gamero's unpaid wage damages are $2,535.00.  Calculating when prejudgment interest began to accrue on this figure is complicated by the fact that Gamero left Koodo Sushi for one year.  And this analysis is complicated further because there is no clear indication of when Gamero stopped working, or when he returned.  *Cf. Maldonado* v. *La Nueva Rampa, Inc.*, No. 10 Civ. 8195 (JLC), 2012 WL 1669341, at *7, *11 (S.D.N.Y. May 14, 2012) (calculating midpoint of employment for employee who worked at "[r]estaurant during two separate periods" by looking to midpoint of each period and "calculat[ing] the principal amounts owed in" damages "for each period").

For purposes of calculating prejudgment interest, the Court will assume that Gamero left Koodo Sushi in November 2013 and returned one year later, as he testified.  (*See* Tr. 120, 132).  Accounting for this gap, the midpoint of Gamero's tenure with Koodo Sushi was August 5, 2013.

## CONCLUSION

For the reasons set forth above, the Court concludes that Plaintiffs are entitled to relief under their First through Seventh Causes of Action.  The Clerk of Court is directed to prepare a judgment reflecting the Court's holding and setting forth Plaintiffs' damages as follows:

> Sanchez:  $2,311.58 in unpaid wages under the NYLL, with 9% prejudgment interest beginning to accrue on April 9, 2012; $972.43 in liquidated damages; and $2,500.00 for Defendants' violation of NYLL § 195(3).

> Mastranzo:  $3,668.07 in unpaid wages under the NYLL, with 9% prejudgment interest beginning to accrue on July 30, 2012; $2,915.04 in liquidated damages; and $2,500.00 for Defendants' violation of NYLL § 195(3).

> Gamero:  $2,535.00 in unpaid wages under the NYLL, with 9% prejudgment interest beginning to accrue on August 5, 2013; $2,535.00 in liquidated damages; $2,500.00 for Defendants' violation of NYLL § 195(1); and $2,500.00 for Defendants' violation of NYLL § 195(3).

"[I]f any amounts remain unpaid upon the expiration of ninety days following issuance of judgment, or ninety days after expiration of the time to appeal and no appeal is then pending, whichever is later, the total amount of judgment shall automatically increase by fifteen percent."  NYLL § 198(4).

***

61

Plaintiffs are also entitled to recover their costs and "reasonable attorney's fees." NYLL § 663(1).  Given that Plaintiffs' recovery is far smaller than they requested, the Court strongly encourages the parties to reach a mutual agreement on attorney's fees and costs.  In the event the parties cannot reach consensus, Plaintiffs are ORDERED to file a motion for fees and costs **on or before October 25, 2017**.  Defendants shall oppose the motion **on or before November 8, 2017**.  Plaintiffs may not file a reply brief.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     September 28, 2017
           New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge